570 So.2d 322 (1990)
William HERMANSON and Christine Hermanson, Appellants,
v.
STATE of Florida, Appellee.
No. 89-02076.
District Court of Appeal of Florida, Second District.
September 28, 1990.
On Motion for Rehearing and Clarification November 21, 1990.
*324 Thomas H. Dart of Dart, Ford, Strelec & Spivey, Sarasota, and Larry Klein of Klein, Beranek & Walsh, P.A., West Palm Beach, for appellants.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Peggy A. Quince and Carol M. Dittmar, Asst. Attys. Gen., Tampa, for appellee.
PER CURIAM.
William and Christine Hermanson seek reversal of their convictions for felony child abuse and third degree murder in the death of their seven-year-old daughter, Amy. Amy died after a lingering illness of juvenile diabetes. During her illness, in lieu of conventional medical treatment, the Hermansons, who are members of the First Church of Christ, Scientist, in Sarasota, provided Amy with a course of spiritual treatment with the assistance of two Christian Science practitioners. Mr. and Mrs. Hermanson's four-year prison sentences, entered on their murder convictions, were suspended, and they were ordered to serve fifteen years' probation on condition that they provide regular medical examinations and treatment for their surviving children. *325 The Hermansons do not challenge their sentences. We affirm the convictions.
The fundamental argument underlying each of the Hermansons' several contentions is that by their prosecution and conviction the state violated their right to freely practice their religion. There is no dispute that they were sincerely practicing the tenets of Christian Science which eschews conventional medical treatment in favor of spiritual healing through prayer.[1] Specifically, the Hermansons argue that (1) their motion to dismiss all charges should have been granted; (2) their motion for judgment of acquittal should have been granted; (3) Florida's child abuse statutes authorized the course of action they took; (4) the jury impermissibly decided whether they were reasonable in following their religious beliefs; and (5) the state, in closing argument, misrepresented a tenet of their church. In its cross-appeal the state (1) urges error in the dismissal of the manslaughter count and (2) claims that the trial court erred in allowing the jury to consider section 415.503(7)(f), Florida Statutes (1985),[2] as a statutory defense. We have considered each of the issues raised by the parties and comment on those pertinent to our disposition.
We agree with the state that an error occurred at the outset of this case which caused an unnecessary legal tangle throughout the entire proceedings: The trial court ruled, at the Hermansons' request in pretrial proceedings, that a portion of section 415.503, which we shall refer to in this opinion as the "spiritual treatment proviso," was available to the Hermansons as a statutory defense to the crimes committed. The erroneous ruling worked to the appellants' advantage but underlies most of the issues raised by them on appeal. Once the context of this case is understood (i.e., that the spiritual treatment proviso is not available as a statutory defense to child abuse and homicide charges although a broader freedom of religion defense could be, and was, presented), then it will be seen that despite this initial error, which is not reversible error, the Hermansons received an eminently fair trial which presents us no occasion to reverse. As the jury could and did determine, the Hermansons' acknowledged absolute right to hold their religious beliefs did not permit them to exercise that right at the price of Amy's life.
Amy died on September 30, 1986, from what was determined by the medical examiner to have been diabetic ketoacidosis due to juvenile-onset diabetes mellitus, a medically treatable condition. According to expert testimony at trial, her death could have been avoided, to a reasonable degree of medical certainty, by medical treatment up to shortly before her death. The state attorney filed an information against each of her parents charging them in three counts with (1) manslaughter in violation of section 782.07, (2) felony child abuse in violation of section 827.04(1), and (3) third degree murder in violation of section 782.04(4). Pursuant to Florida Rule of Criminal Procedure 3.190(c)(4), the Hermansons filed a motion to dismiss the information and, joined by the state, provided the following stipulation for the trial court's use at the hearing on their motion:
1. The Defendant, William F. Hermanson, is 39 years of age. Mr. Hermanson is married to the Defendant, Christine Hermanson, who is 36 years of age. Since June of 1973, Mr. and Mrs. Hermanson have resided in Sarasota, *326 Florida. At all times material to this case, they resided at... . Mr. Hermanson is a bank vice president, and Mrs. Hermanson is the director of the Sarasota Fine Arts Academy. Mr. and Mrs. Hermanson have graduate degrees from Grand Valley State College and the University of Michigan, respectively. Neither Mr. nor Mrs. Hermanson has ever been arrested for, or convicted of, a crime.
2. Mr. and Mrs. Hermanson were married on May 30, 1970. There have been two children born of this marriage: Eric Thomas Hermanson, date of birth 8/26/77 and Amy Kathleen Hermanson (deceased) date of birth 7/16/79. There are no facts indicating that Mr. or Mrs. Hermanson ever deprived their children of necessary food, clothing or shelter as those terms are used in section 827.04, Florida Statutes.
3. According to the autopsy report of the Medical Examiner, James C. Wilson, M.D., on September 30, 1986, at approximately 1:55 p.m., Amy Hermanson died. Dr. Wilson found the cause of death to be diabetic ketoacidosis due to juvenile onset diabetes mellitus. Additional autopsy findings of dehydration and weight loss were consistent with the disease process. Dr. Wilson believes that the disease could have been diagnosed by a physician prior to death and, within the bounds of medical probability, Amy's death could have been prevented even up to several hours before her death with proper medical treatment.
4. At the time of Amy's death, the Hermanson family, including William, Christine, Eric and Amy, were regular attenders of the First Church of Christ, Scientist in Sarasota. William Hermanson has been a member of the Christian Science Church since childhood, and Christine Hermanson has been a member of the Church of Christ, Scientist since 1969. The Church of Christ, Scientist is a well-recognized church or religious organization, as that term is used in Section 415.503, Florida Statutes.
5. Christian Scientists believe in healing by spiritual means in accordance with the tenets and practices of the Christian Science Church. William and Christine Hermanson, at all times material to the facts in this case, followed the religious teachings of their church and relied upon Christian Science healing in the care and treatment of Amy Hermanson.
6. On or about September 22, 1986, the Hermansons became aware that something was particularly wrong with Amy Hermanson which they believed to be of an emotional nature. They contacted Thomas Keller, a duly-accredited practitioner of the First Church of Christ, Scientist for consultation and treatment in accordance with the religious tenets and beliefs of the Christian Science Religion. Thomas Keller treated Amy from September 22, 1986 until September 30, 1986.
7. On or about September 25, 1986, the Hermansons traveled to Indianapolis, Indiana to attend an annual Christian Science conference on healing and left their children in the care of one Marie Beth Ackerman, age 24, a Christian Scientist employed by the Christian Science Committee on Publications and who was residing with the Hermanson family in Sarasota County, Florida and assisting Mrs. Hermanson as an administrator at the Sarasota Fine Arts Academy. The Hermansons returned to their home in Sarasota County, Florida at approximately 2 a.m. on September 29, 1986.
8. After their arrival, the Hermansons noticed a worsening of Amy's condition. They decided to seek the assistance of a local Christian Science practitioner and at approximately 9 a.m. on September 29, 1986, the Hermansons contacted one Frederick Hillier, a duly-accredited Christian Science practitioner of the First Church of Christ, Scientist whom they secured as a practitioner for Amy. Thereafter, until Amy's death, Hillier provided treatment for Amy relying solely on spiritual means for healing in accordance with the tenets and practices of the First Church of Christ, Scientist.
9. On Monday, September 29, 1986, William Hermanson had a discussion *327 with Jack Morton, the father of Christine Hermanson, wherein Mr. Morton expressed his concern for the health of Amy and suggested the possibility that Amy had diabetes.
10. At approximately 9:30 a.m. on September 30, 1986, Hillier went to the Hermanson home to continue treatment and, due to the fact the Hermansons had been up all night with Amy, suggested that a Christian Science nurse be called to help care for Amy.
11. At approximately 10 a.m. on Tuesday, September 30, 1986, one Molly Jane Sellers was called to the Hermanson residence to assist in the care of Amy Hermanson. Molly Jane Sellers is recognized as a Christian Science nurse by the First Church of Christ, Scientist and has been so recognized for twenty years. In preparation for such accreditation by the Church, Sellers completed a three and one-half year training course. Her area of care primarily relates to the physical needs of the patients and, would be closely related to the duties performed by a licensed practical nurse.
12. On September 30, 1986 at approximately 11 a.m., William Hermanson was contacted by a counselor from the Department of Health and Rehabilitative Services (Willy Torres) who informed him that they had received a complaint alleging child abuse of his daughter, Amy Hermanson and that a hearing pursuant to said allegation had been set before the Juvenile Court for 1:30 p.m. Torres further informed Mr. Hermanson that the purpose of the hearing was to determine if medical treatment would be court ordered or if treatment as prescribed by the Christian Science practitioner would be ordered at that time.
13. At approximately 12:30 p.m., Mr. Hermanson left his home and traveled to the Sarasota County Courthouse for the hearing pursuant to the notification from Willy Torres. While at the hearing, at approximately 1:27 p.m., Mr. Hermanson received a telephone call from an individual at the Hermanson home who reported that Amy had "taken a turn for the worse and an ambulance had been called." Such information was related to the Court and an order was entered which required that Amy Hermanson be examined by a licensed medical doctor. When paramedics arrived they found that Amy had died.
14. Prior to her death, Amy Hermanson continued under the care and treatment of Frederick Hillier with the assistance of Molly Jane Sellers until approximately 1:27 p.m. September 30, 1986 at which time Amy had died.
15. On or about October 7, 1986, the Department of Health and Rehabilitative Services notified Mr. and Mrs. William Hermanson that it had completed its investigation and had classified the report as unfounded.
At the hearing on their motion, the Hermansons claimed that they had available to them a statutory affirmative defense to or exemption from culpability by virtue of section 415.503(7)(f). Since the stipulation evidenced no dispute regarding the sincerity of their religious convictions, nor any dispute over the legitimacy of their practicing this religion, they further claimed that this legal defense or exemption was established, thus entitling them to dismissal of all counts of the information. The trial court denied the motion to dismiss insofar as the counts alleging violations of sections 827.04(1) (felony child abuse) and 782.04(4) (third degree murder) were concerned (finding that there remained factual issues to be resolved by the jury). The court also granted the motion to dismiss the count based on section 782.07[3] (manslaughter) and ruled that section 415.503(7)(f) *328 was available to the Hermansons as a statutory defense.[4]
The statutory section at the heart of the appellants' contentions, section 415.503, is the definitions section of a comprehensive statutory scheme to provide protective services to abused or neglected children. This comprehensive scheme is encompassed in sections 415.502 through 415.514. The legislative intent of this scheme is outlined in section 415.502:
415.502 Comprehensive protective services for abused or neglected children; legislative intent.  The intent of ss. 415.502-415.514 is to provide for comprehensive protective services for abused or neglected children found in the state by requiring that reports of each abused or neglected child be made to the Department of Health and Rehabilitative Services in an effort to prevent further harm to the child or any other children living in the home and to preserve the family life of the parents and children, to the maximum extent possible, by enhancing the parental capacity for adequate child care. [Emphasis added.]
The Hermansons claim here, as they did in the trial court, that the legislature has exempted them from what otherwise would be criminal culpability for their crimes by the underscored provision of the following section:
415.503 Definitions of terms used in ss. 415.502-415.514.  As used in ss. 415.502-415.514:
(1) "Abused or neglected child" means a child whose physical or mental health or welfare is harmed, or threatened with harm, by the acts or omissions of the parent or other person responsible for the child's welfare.
... .
(7) "Harm" to a child's health or welfare can occur when the parent or other person responsible for the child's welfare:
(f) Fails to supply the child with adequate food, clothing, shelter, or health care, although financially able to do so or although offered financial or other means to do so; however, a parent or other person responsible for the child's welfare legitimately practicing his religious beliefs, who by reason thereof does not provide specified medical treatment for a child, may not be considered abusive or neglectful for that reason alone,[5] but such an exception does not:
1. Eliminate the requirement that such a case be reported to the department;
2. Prevent the department from investigating such a case; or
3. Preclude a court from ordering, when the health of the child requires it, the provision of medical services by a physician, as defined herein, or treatment by a duly accredited practitioner who relies solely on spiritual means for healing in accordance with the tenets and practices of a well-recognized church or religious organization.
The Hermansons also claim that since they were specifically performing an act authorized by the spiritual treatment proviso, that is, treating their daughter through spiritual rather than medical means, section 415.511 provides them further immunity. Section 415.511 states that:
Any person, official, or institution participating in good faith in any act authorized or required by ss. 415.502-415.514 shall be immune from any civil or criminal liability which might otherwise result by reason of such action.
We disagree with the Hermansons' view of the effect of both section 415.503(7)(f) and section 415.511. We find that there is no authorization in any of the sections of this statutory scheme for a parent to permit the death of a child by the failure of *329 the parent to provide readily available medical treatment. Moreover, any immunity provided in section 415.511 attaches only to those acts which we find are specifically authorized in this chapter as we will explain.
The statutory scheme contained in sections 415.502-415.514 provides the mechanism for reporting suspected child abuse or neglect so that this may be investigated and stopped if substantiated. See § 415.502. The focus of the entire chapter is on the reporting, investigation and prevention of child abuse. Any "authorization" contained in this scheme is directed to all citizens; any person who becomes aware of or in good faith suspects child abuse or neglect must report such information to the Department of Health and Rehabilitative Services [hereinafter HRS]. Section 415.504(1). HRS is also authorized to perform many functions pursuant to this chapter, such as keeping a Central Abuse Registry, investigating complaints of child abuse or neglect, and formulating the necessary regulations to implement the legislative directives. Indeed, if a death is involved, different responsibilities come into play since the directives of chapter 415 do not provide the means for handling such a situation. "Any person required to report or investigate cases of suspected child abuse or neglect who has reasonable cause to suspect that a child died as a result of child abuse or neglect shall report his suspicion to the appropriate medical examiner" who shall make his own investigation and report to the state attorney, local law enforcement, and HRS. Section 415.504(3). This section emphasizes the legislative intent that HRS's involvement is in an effort to preclude the occurrence of such harm; when a death occurs, this ultimate harm has not been avoided and actions by other state agencies are triggered. The spiritual treatment proviso is not a defense provided by statute, nor "an authorized act," as the appellants claim, but rather it directs HRS that, for HRS's purposes of reporting and investigating, HRS shall not consider parents who fail to provide necessary medical treatment because of religious beliefs as abusive or neglectful for that reason alone. For an excellent analysis of a similar spiritual treatment proviso appearing in the California statutes, see Walker v. Superior Court, 47 Cal.3d 112, 253 Cal. Rptr. 1, 763 P.2d 852, cert. denied, ___ U.S. ___, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1988).
Further, the primarily administrative aspect of the scheme is apparent because nowhere does it provide for criminal penalties for actual child abuse or neglect. Instead, criminal penalties for child abuse or neglect are established by the legislature separately in chapters 782 and 827. Importantly, the only criminal penalties provided in chapter 415 are contained in section 415.513:
415.513 Penalties for failing to report or preventing another person from reporting, or disclosing confidential information relating to, a case of child abuse or neglect. 
(1) Any person required by s. 415.504 to report known or suspected child abuse or neglect who knowingly and willfully fails to do so, or who knowingly and willfully prevents another person from doing so, is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(2) Any person who knowingly and willfully makes public or discloses any confidential information contained in the abuse registry or in the records of any child abuse or neglect case, except as provided in ss. 415.502-415.514, is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
Thus, the only crimes defined under this scheme are misdemeanor offenses which occur when one fails to report something which one has a statutory duty to report or when one divulges information which the statute makes confidential.
The emphasis on reporting and investigating allegations of child abuse and neglect is further underscored by the requirement in section 415.505(1)(g) that HRS report to the state attorney and the appropriate law enforcement agency any physical injuries that have been substantiated *330 through its investigative efforts. When such report is made to the state attorney and law enforcement, criminal investigations may be initiated. Up to this point of handing over the case to agencies with prosecutorial power, the whole focus of the statutory scheme has been an administrative effort to eradicate the abuse or neglect and to preclude further abuse or neglect. When section 415.505(1)(g) comes into play, the administrative duties of HRS continue, since HRS must cooperate with law enforcement, but the criminal investigation and prosecution are triggered and proceed under other chapters of our statutes.
The Hermansons correctly note that the statutory scheme contained in sections 415.502-415.514 was originally located by the legislature as part of chapter 827, the chapter providing criminal sanctions for child abuse. They argue that such initial placement in chapter 827 reveals a legislative intent that the spiritual treatment proviso be available as a legal defense to parents such as they, accused of felony child abuse under chapter 827, and third degree murder and manslaughter under chapter 782. We are not persuaded.
It is true that the spiritual treatment proviso was first enacted in chapter 75-185, Laws of Florida, and made a part of section 827.07(2). It thus became part of the 1975 statutory scheme for reporting and investigating child abuse. By the specific terms of section 827.07(2), the spiritual treatment proviso was limited to the stated purposes of section 827.07, reporting, investigating and prevention of child abuse, and did not form part of section 827.04(1), the section which defines the crime of felony child abuse. That entire reporting and investigative scheme, now including the spiritual treatment proviso, was later moved, enlarged and renumbered sections 415.502-415.514, where it continues to be found today. Like the original spiritual treatment proviso when it was contained in section 827.07, the same spiritual treatment proviso, appearing today in section 415.503, is still limited to those same reporting, investigative and prevention purposes of sections 415.502-415.514. In contrast to its inclusion of the spiritual treatment proviso for purposes of sections 415.502-415.414, the legislature chose not to include the spiritual treatment proviso in the statutes creating the crime of child abuse, section 827.04(1), the crime of third degree murder, section 782.04, and the crime of manslaughter, section 782.07.[6] The specifically limited application of section 415.503 is also in contrast to the recognized statutory affirmative *331 defenses the legislature has chosen to include in, for example, chapters 776 and 782.[7] In sum, the spiritual treatment proviso in the statutory scheme for protecting children and preventing child abuse by way of reporting and investigating allegations of child abuse is not a statutory defense to, or an immunity or exemption from, prosecution for felony child abuse, third degree murder or manslaughter.[8]
We turn now from the arguments based on the interpretation of our statutes to the Hermansons' constitutional argument, i.e., that their prosecution is barred by the Free Exercise of Religion clauses of the United States and the State of Florida Constitutions. After careful consideration of the Hermansons' arguments, and our study of the cases, we find that there is no constitutional impediment, in the First Amendment to the United States Constitution or in article I, section 3 of the Florida Constitution, to a prosecution for felony child abuse, third degree murder or manslaughter for failure to provide necessary medical care when based on sincerely held religious beliefs. Employment Div., Dep't of Human Resources v. Smith, ___ U.S. ___, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (state cannot ban performance of or abstention from physical acts solely because of their religious motivation, but Free Exercise Clause does not relieve individual of obligation to comply with law that incidentally forbids or requires performance of an act that his religious belief requires, or forbids, if law is not specifically directed to religious practice and is otherwise constitutional as applied to those who engage in the act for nonreligious reasons); Prince v. Massachusetts, 321 U.S. 158, 166-70, 64 S.Ct. 438, 442-44, 88 L.Ed. 645, 653-54 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death... . Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and logical discretion when they can make that choice for themselves."). The state may intervene when it appears that the parents' decision "will jeopardize the health or safety of the child, or have a potential for significant social burdens." Wisconsin v. Yoder, 406 U.S. 205, 234, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972). A prosecution for murder based on the death of a child because of a failure to provide necessary medical treatment is a proper function of the state. Hall v. State, 493 N.E.2d 433 (Ind. 1986); Commonwealth v. Barnhart, 345 Pa.Super. 10, 497 A.2d 616 (1985); see People v. Pierson, 176 N.Y. 201, 68 N.E. 243 (1903), for an especially cogent statement of the underlying rationale of the parent's duty to provide necessary medical care to minors. Based on Wisconsin v. Yoder, several states have held that a parental decision against medical treatment is not an absolute right in life-endangering circumstances. Muhlenberg Hospital v. Patterson, 128 N.J. Super. 498, 320 A.2d 518 (1974) (courts are the guardian of religious rights of individuals and will "see that this power of the State is not exercised beyond the area where treatment is necessary for the sustaining of life or the prevention of grievous bodily injury"); see also, In re Green, 448 Pa. 338, 292 A.2d 387 (1972); see generally People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769 (1952); Mitchell v. Davis, 205 S.W.2d 812 *332 (Tex.Civ.App. 1947). The state, as parens patriae, has the responsibility to intervene between parent and child when there is demonstrated physical harm occurring to the child that puts a reasonable person on notice that medical intervention is necessary for the sake of the child's life. Compare Public Health Trust v. Wons, 541 So.2d 96 (Fla. 1989) (competent adult may decide to forego life-saving medical treatment for herself based on religious reasons without state intervention despite fact that her expected death will leave minors motherless).
Having laid aside any statutory religious defense based on the spiritual treatment proviso, and having found no constitutional impediment to the appellants' prosecution, our task now is to examine the Hermansons' further contention that their Florida Rule of Criminal Procedure 3.190(c)(4) motion to dismiss should have been granted because the undisputed facts of the stipulation did not present a case that they acted willfully or with culpable negligence in failing to provide medical treatment for their daughter. The stipulation showed that Amy's concerned grandfather, the day before Amy's death, suggested to Mr. Hermanson the possibility that diabetes was the cause of her deteriorating condition. The stipulation also states that on approximately September 22, 1986, eight days before Amy's death, the parents became aware that something was wrong, although they believed it to be of an emotional nature. When they returned from a Christian Science assembly in Indiana approximately thirty-six hours before Amy's death, they noted that her condition had worsened. The court found that these statements, and the inferences arising from them, showed material facts at issue, namely, just how serious was the condition that Amy presented so that her parents were put on notice that their attempts at spiritual treatment were unavailing and it was time to call in medical help. We agree that material facts remained for the jury on the questions of the seriousness of Amy's condition and whether the Hermansons were culpably negligent in the circumstances. Thus the trial court was correct in denying the motion to dismiss.
Regardless of the correctness of the trial court's ruling on the motion to dismiss, the Hermansons argue that a parent who relies on spiritual rather than medical treatment will never know beforehand when the line is crossed where they should stop relying on spiritual treatment alone and seek medical intervention. This contention forms the basis of their claim that their due process rights have been violated because the statutes containing the term "culpable negligence" do not give them sufficient notice of what behavior constitutes a criminal act and when that behavior occurs. This argument has been satisfactorily answered for us by a statement by Justice Oliver Wendell Holmes as cited and amplified in Walker v. Superior Court, the case which recently construed California statutes similar to our own:
[Defendant] frames her argument in the form of a rhetorical question: "Is it lawful for a parent to rely solely on treatment by spiritual means through prayer for the care of his/her ill child during the first few days of sickness but not for the fourth or fifth day?" Justice Holmes correctly answers: "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.... `An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it' by common experience in the circumstances known to the actor." (Nash v. United States (1913) 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232; see also Coates v. City of Cincinnati (1971) 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214.) The "matter of degree" that persons relying on prayer treatment must estimate rightly is the point at which their course of conduct becomes criminally negligent. In terms of notice, due process requires no more. (Burg v. Municipal Court, supra, 35 Cal.3d at p. 270, 198 Cal. Rptr. 145, 673 P.2d 732.)
*333 Walker v. Superior Court, 763 P.2d at 872. Similar to the court in Walker, we conclude that sections 827.04 and 782.07 comply with the requirements of due process.
We have, to this point, dealt with the issue of why the spiritual treatment proviso of section 415.503 and the United States and Florida Constitutions do not provide a bar to the prosecution and conviction of the Hermansons. We focus now on alleged errors occurring at trial. The remaining issues deal with improper inquiry by the jury, prosecutorial misconduct, and sufficiency of the evidence. The Hermansons present these issues, understandably, on the basis of the trial court's erroneous pretrial ruling in their favor that the spiritual treatment proviso of 415.503(7)(f) was available to them to put forth at trial as a statutory affirmative defense; therefore, their arguments are posed in such a manner as to indicate that they believed there existed an inviolate right to practice their religion to the detriment of their daughter's life. As we have explained above, this argument has no merit. Prince v. Massachusetts. Our holding that the spiritual treatment proviso is not a statutory defense does not, however, preclude a defendant from presenting to the jury any theory of defense, including that of a sincerely-held religious belief, to excuse, explain, mitigate or justify the defendant's behavior under the circumstances. Indeed, that is exactly what happened in this case. The Hermansons were allowed wide latitude in arguing that they should be excused or that their behavior was justified as based on a bona fide religious belief. This theory of defense was vigorously presented in opening and closing argument, cross-examination of the state's witnesses, and jury instructions. The initial pretrial error, concerning the spiritual treatment proviso, permeated the ensuing trial and afforded the Hermansons at trial an opportunity they should not have had  an opportunity to argue that the reasons for their actions were sanctioned by the state.
Focusing, then, on the trial itself, the first of the issues is the appellants' contention that the jury impermissibly questioned the reasonableness of the Hermansons in following their religious beliefs. To demonstrate this alleged error, they point to three questions the jury directed to the trial court during their deliberations, questions concerning what and when medical treatment is allowed by the Christian Science Church:
1. As a Christian Scientist do they have a choice to go to a medical doctor if they want to?
2. Or if not, can they call a doctor at a certain point?
3. Do they need permission first?
Prior to these jury questions, the Hermansons' defense counsel in closing argument had placed great weight on the statutory language of section 415.503:
The Court is going to tell you that you should determine  it's up to you  you should determine if the Defendants, in declining to provide medical treatment for their daughter, were relying on their religious beliefs by providing spiritual care through Christian Science.
Have you ladies and gentlemen any doubt in your mind that that's what they were doing? I submit to you that you couldn't have.
Listen to this: In determining whether the evidence shows the Defendants  that's the Defendants now  were following their religious beliefs in caring for their daughter  and listen carefully to this, ladies and gentlemen  you are not to decide  you are not to decide  if the Defendants  that's Chris and Bill Hermanson  correctly interpreted the teachings of their religion, only whether the Defendants held a sincere belief  only whether the Defendants held a sincere belief  that the teachings of their religion authorized them to take a particular course of action.
The Court is going to go further and tell you that you may not question  that you may not question  the wisdom or the sincerity of the Defendants' belief and nor the wisdom or effectiveness of spiritual healing of the Christian Science *334 Church, or the basic tenets of their religion.
What that is saying  and if you think back, you may recall when we were selecting you for jury duty, that I tried to tell every one of you  that under our law, if selected to serve as a juror in this case, no matter what your personal beliefs, no matter what your own church or religious denomination, that the law does not permit you to question the religious beliefs of someone else. You can question whether they're sincere beliefs, but you cannot question the merits of it; you cannot question the wisdom of it; you cannot question the effectiveness of it. Only if they sincerely believed  only if they sincerely believed.
That's the law of this land. That's not a law just made in Florida. That's the law of the United States that has been hammered out in the crucibles of these courtrooms and in the legislative halls of this country since Plymouth Rock  maybe not all the way back to Plymouth Rock, but close to it  when we were given a Republican form of government to guide our lives.
The Court is going to also tell you this, that the State of Florida  and please remember this  that the State of Florida authorizes  authorizes  a parent, parents' use of a duly accredited practitioner who relies  who relies  solely on spiritual means  who relies solely on spiritual means  for healing, in accordance with the tenets and practices of a well-recognized church, or religious organization, in caring for the health of a child.
The court, having granted the Hermansons' request for instructions, then explained to the jury the availability of the statutory defense (which, as we have said, was the only error) but went on correctly to admonish the jury about what they could not decide:
An issue in this case is whether the killing of Amy Hermanson was excusable. The killing of a human being is excusable if committed by accident and misfortune. In order to find the killing was committed by accident or misfortune, you must find that each Defendant was doing a lawful act by lawful means and with usual care, and acting without any unlawful intent.
It is a defense to child abuse and third degree murder if parents failed to provide medical treatment for their child because they were legitimately practicing their religious beliefs. An issue in this case is whether the Defendants, in declining to seek conventional medical treatment for Amy Hermanson, were following their religious beliefs.
Section 415.503 of the Florida Statute provides in part as follows: A parent, or other person responsible for the child's welfare, legitimately practicing his religious beliefs, who by reason thereof does not provide specified medical treatment for a child, may not be considered abusive or neglectful for that reason alone.
You should determine if the Defendants, in declining to provide conventional medical treatment for Amy Hermanson, were relying on their religious beliefs by providing spiritual care through Christian Science.
I instruct you that The Church of Christ, Scientist, is a well-recognized religion under the law of Florida.
In determining if the evidence shows that the Defendants were following their religious beliefs in caring for their daughter, you are not to decide if the Defendants correctly interpreted the teachings of their religion, only whether the Defendants held a sincere belief that the teachings of their religion authorized them to take a particular course of action.
As is evident, the jury did not impermissibly question the reasonableness or legitimacy of Christian Science beliefs as the Hermansons contend. Indeed, they may not do so. See Thomas v. Review Board of Indiana Employment Security Div., 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection"). The appellants misperceive the import of the jury's three questions. The jury was not deciding *335 whether the beliefs were reasonable, but rather whether the appellants' behavior was reasonable.
In a criminal prosecution, deciding the reasonableness of an accused's actions is a proper function of the jury, even when those actions are based on sincerely-held religious beliefs.
We [the United States Supreme Court] have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. As described succinctly by Justice Frankfurter in Minersville School Dist. Bd. of Educ. v. Gobitis, 310 U.S. 586, 594-595, 60 S.Ct. 1010, 1012-1013, 84 L.Ed. 1375 (1940): "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities (footnote omitted)." We first had occasion to assert that principle in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879), where we rejected the claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice. "Laws," we said, "are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices... . Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." Id., at 166-167.
Employment Div., Dep't of Human Resources v. Smith, ___ U.S. ___, 110 S.Ct. at 1600, 108 L.Ed.2d 876 (1990).
The trial judge, upon receiving the jury's questions and after consulting with the prosecution and defense counsel, properly declined to further instruct the jury since the questions inquired of factual matters surrounding what were the tenets of the Christian Science faith, and not whether these were valid beliefs to hold.[9] It is true that there was little dispute as to the sincerity[10] of the Hermansons' religiously-held beliefs. The questions propounded to the court by the jury clearly show that the jury was merely doing exactly what the Hermansons had asked of them  deciding whether the appellants were sincerely practicing their religion. But the Hermansons' sincerity is not the issue in this case. The controlling issue here is whether the Hermansons could present a defense to their crimes based on religion. They could and they did. The fact that they should not have been allowed to frame the defense in terms of the statute did not vitiate the overall fairness of the proceedings nor did it prevent them from presenting a theory of defense based on religious practices. The Hermansons cannot now be heard to complain of jury questions which they clearly invited and which are tangential in any event.[11]
*336 The next alleged trial error the Hermansons raise occurred in the state's closing argument when the prosecutor attempted to point out the culpability of the Hermansons because, as he explained it, the evidence showed that Christian Science doctrine does at some point in time allow medical treatment and, thus, the Hermansons failed to follow this doctrine and provide such care. According to the state, this was an example that the Hermansons were not sincerely following their religious beliefs, and, therefore, could not partake of the statutory language of section 415.503(7)(f). This argument was prompted by testimony from Molly Sellers, the Christian Science nurse accredited by the Church, who had been called in to look after Amy and take care of her physical needs the last morning of her life. Ms. Sellers testified to the effect that she needed to call an ambulance for Amy. She requested use of the phone from Frederick Hillier, the Christian Science practitioner who was in the home to help Amy with the spiritual healing. He delayed her until he could call Boston (the Church's headquarters) after which he allowed her to call the ambulance. The prosecutor was forced to argue the misleading non-issue of sincerity as framed by the Hermansons when they presented the "legitimately practicing" language of section 415.503(7)(f), (i.e., that if they were sincerely or legitimately praticing their religious beliefs, then the laws of Florida provided them a statutory defense). We can only interpret the prosecutor's remarks as fair comment on the evidence and the inferences from that evidence, that these two people, Church licensed professionals whom the jury could reasonably conclude represented the Church, allowed conventional medical treatment to be given to Amy. We find no error in this issue.
On the appellants' last issue, the sufficiency of the evidence supporting the jury's verdict, we have examined the evidence presented to the jury as contained in the trial record before us to determine if such evidence was legally sufficient for the jury to find them guilty of culpable negligence. Culpable negligence will be shown by gross or flagrant conduct evincing a reckless disregard for human life. State v. Greene, 348 So.2d 3 (Fla. 1977).
Several witnesses who had observed Amy's condition and behavior testified for the state. We summarize this testimony in a light most favorable to the jury verdict. In the month or so before her death Amy was having a marked and dramatic weight loss, that she was almost skeletal in her thinness and this was a big change in her appearance. There were great dark circles under her eyes that had never been there before. Her behavior was very different from the usual; she was lethargic and complaining whereas previously she had been bubbly, vivacious, and outgoing. She was seen lying down on the floor to sleep during the day when accompanying her mother to visit music students and lying down on the floor after school at her mother's fine arts academy. She often complained of not feeling well, that her stomach hurt and that she wasn't sleeping well. She was too tired during the day to participate in gym class at school. There was a bluish tint to her skin. Her breath smelled funny, one observer called it a "fruity" odor.
The pathologist who performed the autopsy testified to Amy's skeletal appearance, that her vertebrae and shoulder *337 blades were prominent and her abdomen distended as if she were undernourished. Her eyes were quite sunken, due to the dehydration, although her parents had told the pathologist that on the day before her death she was drinking a lot of fluids but urinating frequently too. They also told him that they had noticed changes in Amy starting about a month previously. Amy had complained of constipation during the last week of her life but at no time seemed feverish although there was intermittent vomiting. The pathologist opined that the illness was chronic, not acute. According to her parents' talk with the pathologist, Amy seemed incoherent on the evening before her death although the next morning she seemed better. The pathologist also testified that vomiting and dehydration are compatible with flu-like symptoms but these, added to a four-week-long history of weight loss with the more severe conditions reported, would not be indicative of flu.
Finally, the jury was shown photographs of Amy taken shortly after she died before her body was removed from the home by the paramedics as well as some taken before the autopsy was performed. These provided a very graphic illustration of her deteriorated condition.
In the face of their daughter's deteriorating condition, the Hermansons chose to forego conventional medical treatment and, in lieu thereof, they provided spiritual treatment through a Christian Science practitioner.
After reviewing this record we hold that the trial judge was correct in denying the Hermansons' motion for judgment of acquittal; the evidence presented was sufficient for the jury to find that they had acted in reckless disregard of Amy's health, and ultimately, her life.
In sum, having examined each issue presented to us on appeal, we find only that an error occurred when the Hermansons were allowed to present a theory of defense framed in such a manner as to suggest that the state, by statute, sanctioned their conduct. This error in no way prejudiced the Hermansons  indeed, it benefitted them. The record shows that a viable, if ultimately unsuccessful, theory of defense was presented in an eminently fair trial.
Finding no reversible error, we affirm.
SCHOONOVER, C.J., and DANAHY and THREADGILL, JJ., concur.

ON MOTION FOR REHEARING AND CLARIFICATION
The motion of the appellants is denied, except for that portion requesting that we certify a question of great public importance to our supreme court, which we grant. Therefore, we certify the following question to the Supreme Court of Florida:
IS THE SPIRITUAL TREATMENT PROVISO CONTAINED IN SECTION 415.503(7)(f), FLORIDA STATUTES (1985), A STATUTORY DEFENSE TO A CRIMINAL PROSECUTION UNDER SECTION 827.04(1), FLORIDA STATUTES (1985)?
SCHOONOVER, C.J., and DANAHY and THREADGILL, JJ., concur.
NOTES
[1] The Hermansons cite the following explanation for a fuller understanding of this belief:

The cure of disease through prayer is seen as a necessary element in a full redemption from the flesh. Church historian Karl Holl summarizes the concept of treatment, or prayer, in Christian Science as "a silent yielding of self to God, an ever closer relationship to God, until his omnipresence and love are felt effectively by man," and he distinguishes this decisively from willpower or mental suggestion.
Baumgartner v. First Church of Christ, Scientist, 96 Ill.Dec. 114, 141 Ill. App.3d 898, 490 N.E.2d 1319, 1321, cert. denied, 479 U.S. 915, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986), quoting Encyclopedia Britannica, Macropaedia, vol. 4, pp. 562-64 (15th ed. 1984).
[2] All statutory references in this opinion are to the 1985 statutes unless specifically stated otherwise.
[3] We comment briefly on the state's issue concerning the dismissal of the manslaughter count. We do not agree with the trial court that Bradley v. State, 84 So. 677 (Fla. 1920) mandated the dismissal. Because of changes in our child abuse statutes since Bradley was decided, we think, under proper circumstances, a prosecution for manslaughter will lie. Nevertheless, because of our disposition of this case and the double jeopardy concerns expressed by our supreme court in Carawan v. State, 515 So.2d 161 (Fla. 1987), and State v. Smith, 547 So.2d 613 (Fla. 1989), we affirm this issue.
[4] In its order, the trial court also ruled that section 415.503(7)(f) was not an unconstitutional establishment of religion as the state had argued. This issue has not been presented to us in this appeal and we make no comment on it.
[5] This underscored language is what we refer to in this opinion as the "spiritual treatment proviso."
[6] 827.04(1) Child abuse. 

(1) Whoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, permits physical or mental injury to the child, and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to such child, shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
782.04 Murder. 
... .
(4) The unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, any felony other than any:
(a) Trafficking offense prohibited by s. 893.135(1),
(b) Arson,
(c) Sexual battery,
(d) Robbery,
(e) Burglary,
(f) Kidnapping,
(g) Escape,
(h) Aggravated child abuse,
(i) Aircraft piracy,
(j) Unlawful throwing, placing, or discharging of a destructive device or bomb, or
(k) Unlawful distribution of opium or any synthethic or natural salt, compound, derivative, or preparation of opium by a person 18 years of age or older, when such drug is proven to be the proximate cause of the death of the user,
is murder in the third degree and constitutes a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
782.07 Manslaughter.  The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, shall be deemed manslaughter and shall constitute a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
[7] In these chapters the legislature has enumerated the following statutory affirmative defenses: self-defense and defense of another (776.012); avoiding a trespass, defense of property or to avoid the commission of a forcible felony (776.031); preventing an escape (776.07); justifiable use of deadly force to resist murder or commission of a felony upon a person or in a dwelling (782.02); and excusable homicide because of accident or misfortune by lawful means with usual care, heat of passion, sudden and sufficient provocation, and sudden combat (782.03).
[8] Because the Hermansons were not charged with any misdemeanor violation of chapter 415, we make no comment on the effect of the spiritual treatment proviso on a proceeding under that chapter. Our holding is limited to the effect of the absence of the spiritual treatment proviso in the crimes defined in chapters 782 and 827, the chapters under which the Hermansons were charged.
[9] Furthermore, pursuant to Florida Rule of Criminal Procedure 3.390(d), when the trial judge failed to give an instruction, defense counsel made no objection nor complaint to the judge, as they do to us, that the jury was thereby invading impermissible constitutional territory in questioning the legitimacy of the Hermansons' beliefs. There was no motion made by the appellants for mistrial nor for an admonishment or clarification by the judge. This is understandable considering the instructions submitted by the Hermansons and given by the judge. The jury's questions were only prompted by the posture of the case (the mistaken statutory defense) and the role they were placed in to decide the sincerity of the religious beliefs as held by the Hermansons.
[10] While section 415.503(7)(f) uses the term "legitimately practicing," the arguments of counsel and the jury instructions equate this with "sincerely practicing." We, too, equate these terms for purposes of this opinion.
[11] The questions propounded by the jury to the court showed that they wished to know more about the practices of the Christian Science religion  clearly a factual matter. Before one can decide if a defendant is sincerely practicing his or her religion, one must know the practices of that religion. While the Hermansons argue in this appeal that, in fact, Church doctrine under no circumstances approves conventional medical intervention, there is nothing in the record which irrefutably establishes such a fact. The jury had before it conflicting evidence of what Christian Scientists do; on one hand, several witnesses testified they knew that precisely because the Hermansons were Christian Scientists, a doctor would never be called in for Amy; on the other hand, the Christian Science nurse wanted to call an ambulance. It is not the function of this court to reweigh the credibility of the witnesses after the jury has done its duty. Because this issue is framed in the context of sincerity in practicing a religion within the definition of section 415.503(7)(f), a non-issue that should never have been placed before the jury, these jury questions provide no reason to reverse when the broader freedom of religion defense was before the jury who rejected it as an excuse for the Hermansons' conduct.