# ANTON HERBES AND ANOTHER v.
# VILLAGE OF HOLDINGFORD.

125 N. W. (2d) 426.

December 6, 1963—No. 38,938.

*Joseph C. Vesely* and *Vesely & Otto,* for appellant.
*Burns & Burns* and *Mahoney & Mahoney,* for respondents.

NELSON, JUSTICE.

Plaintiffs, Anton Herbes and Mary Herbes, brought separate actions as parents of Lloyd C. Herbes, their minor son, to recover damages under the Civil Damage Act, Minn. St. 340.95.

On December 23, 1958, at approximately 11:50 p. m., a collision occurred on State Highway No. 152, at a point about 20 miles south of St. Cloud, Minnesota, between an automobile being driven in a norther-

ly direction by Lloyd, then 18 years of age, and another automobile being driven by Lyle Kiley in a southerly direction. Both drivers were killed. Each driver was alone in his automobile and there were no witnesses to the actual collision.

Lloyd was graduated from high school in May 1958 and shortly thereafter obtained employment in Minneapolis as a machine operator with Federal Container Corporation. He lived in Minneapolis at a roominghouse while so employed. He returned home most weekends to the farm of his parents located near St. Francis, Minnesota, approximately 12 miles north of Freeport, arriving on Friday nights and returning to Minneapolis Sunday afternoons. He was unmarried.

At the date of his death he had worked for Federal Container Corporation approximately 27 weeks and had earned a total wage of $2,342.18, from which $52.68 had been withheld for Social Security and $355.30, for Federal income tax, leaving a net take-home pay for this period of $1,934.20, or an average of $71.60 per week before deduction of state income tax.

Plaintiffs, Lloyd's parents, were each approximately 53 years of age at the time of his death. At that time they resided on and operated their farm near St. Francis, and they have continued to do so. An older son, Melvin Herbes, who was about 25 years of age at the time of the trial, is married and lives in St. Cloud.

The record indicates that the Herbes farm consists of approximately 120 acres of land and that at the time of trial 100 acres were under cultivation, consisting of 35 acres in corn, another 35 acres in hay, and the remaining 30 acres in oats. There were 30 head of cattle, 15 of which were milk cows. Plaintiffs raised between 75 and 100 hogs each year. The testimony indicates that the gross income from the operation of the farm annually, both before and after the fatal collision, was from $6,000 to $7,000 per year. The record does not indicate any change in the operation of the farm following the accident.

Defendant, village of Holdingford, operated an exclusive municipal liquor store in the village at the time the collision occurred. On the day of the accident, Lyle Kiley was a customer in defendant's store during different times of the day and evening. The testimony indicates that he

consumed strong beer from time to time, that he played cards there during the day, and that sometime around 7 p. m. an altercation occurred in the store between Kiley and one Ed Dickhausen, instigated primarily by the latter and resulting in his removal from the premises by a policeman. Later in the evening Mr. Kiley left the liquor store and went to a locker plant in Holdingford to get several packages of meat, which were placed in his automobile. He again returned to the liquor store and remained there until approximately 11 p. m. when he left for home, a short time before the occurrence of the collision.

It is the contention of the plaintiffs that defendant served intoxicating beverages to Lyle when he was obviously intoxicated. There was testimony to that effect. Defendant contends, however, that it did not.

At the conclusion of the trial the jury returned a verdict in favor of the plaintiffs of $30,000 from which, pursuant to instructions by the trial court, there was subtracted the sum of $9,000 previously recovered by the plaintiffs through a settlement with the representatives of the estate of Kiley. Defendant thereafter made a motion for an order declaring a mistrial, setting aside the verdict, and granting a new trial; for judgment notwithstanding the verdict of the jury; or for a new trial. The village appeals from an order denying this motion.

■ In its assignments of error defendant asserts that the court erred in denying its motion at the close of the testimony to strike from the record all testimony by Celestine and Joe Evans, who were witnesses for plaintiffs. In support of this assignment of error, defendant claims that it had no opportunity to cross-examine these witnesses. The trial court in its memorandum states that there was no intimation by defendant that it desired such opportunity, and that, had there been a proper request, cross-examination would have been granted as a matter of course. Under the circumstances we must agree with the trial court that this assignment cannot be treated seriously.

■ Defendant also contends that the court erred in admitting into evidence reports of laboratory analyses of the alcoholic content in the blood of the automobile drivers.

The record shows that defendant waived its objection to foundation for the reports, its only other objection being that they were hearsay,

incompetent, irrelevant, and immaterial. The objection was hardly specific enough to advise the court of the ground defendant claimed would justify exclusion of the reports, and the court did not err in admitting them into evidence.

■ Defendant argues that the court erred in denying its request for an instruction as follows:

"Minnesota Statutes, Sec. 340.95, which reads:

" 'Every husband, wife, child, parent, guardian, employer, or other person who is injured in person or property, or means of support, by an intoxicated person or by intoxication of any person has a right of action, in his own name, against any person who by illegally selling, bartering or giving intoxicating liquors caused the intoxication of such person, for all damages, sustained * * *'
is not to be construed by you as a penalty against the defendant village.

"The plaintiff has the burden of proving by a fair preponderance of the evidence what means of support, if any, he may have lost by reason of the death of Lloyd Herbes.

"The law is not to be looked upon by you as a penalty for selling intoxicating liquors or beverages."

The court in its instructions read § 340.95 and also said:

"Another statute, M. S. A. 340.14, provides that no intoxicating liquor shall be served or furnished for any purpose to a person obviously intoxicated.

"The Village of Holdingford is a municipal corporation of the State of Minnesota which operates a municipal liquor store. In its operation of this liquor store, the Village of Holdingford is required to obey the laws of this state, exactly the same as a private person or corporation operating a liquor store is required to obey those laws. A village necessarily operates through its officers and employees. It is the claim of plaintiffs that one or more of the village employees in the Liquor Store sold or furnished intoxicating liquor to Lyle Kiley when he was obviously intoxicated. If you find that any employee of the Holdingford Liquor Store sold or furnished intoxicating liquor to Lyle Kiley when

Kiley was obviously intoxicated, it was an unlawful act on the part of the defendant Village of Holdingford."

Defendant's contention that the trial court should have cautioned the jury not to look on § 340.95 as a law imposing a penalty on defendant again raises the issue of whether that statute is penal or remedial in nature. That question was considered in Adamson v. Dougherty, 248 Minn. 535, 81 N. W. (2d) 110. In that case we reviewed prior decisions, including Beck v. Groe, 245 Minn. 28, 70 N. W. (2d) 886, 52 A. L. R. (2d) 875; Philips v. Aretz, 215 Minn. 325, 10 N. W. (2d) 226; and Mayes v. Byers, 214 Minn. 54, 7 N. W. (2d) 403, 144 A. L. R. 821. We pointed out that our language in those cases was directed toward the proper construction of Minn. St. 1941, § 340.12(4), which provided that the bond required of an applicant for a license to sell intoxicating liquor "is declared to be a penalty." In the Adamson case we also said (248 Minn. 541, 81 N. W. [2d] 114):

"* * * [I]n Mayes v. Byers, *supra,* we distinguished M. S. A. 1941, § 340.12(4), from § 340.95 as follows * * *:

" 'Reference is made to cases denying recovery under statutes such as Minn. St. 1941, § 340.95 (Mason St. 1927, § 3239), to a plaintiff who himself contributed to the intoxication of the person causing him injury. * * * They are inapplicable. *Section 340.95 does not manifest a legislative intent to protect the beneficiaries of the statute from their own failures or to impose a penal liability.* See Sworski v. Colman, 204 Minn. 474, 283 N. W. 778.' * * *

"In Philips v. Aretz, 215 Minn. 325, 10 N. W. (2d) 226, the issue determined was the penal character of M. S. A. 1941, § 340.12(4), rather than § 340.95, the court again as in Mayes v. Byers, *supra,* giving effect to the express provision therein that: '* * * the amount specified in such bond is declared to be a penalty, * * *.'

*       *       *       *       *

"* * * The language of the Beck case to the effect that a suit under the Civil Damage Act is a means to impose a penalty on a dealer of intoxicating liquor was used to indicate that the defenses of contributory negligence or lack of guilty knowledge are not available in

an action for damages under § 340.95; but not, as plaintiff suggests, to determine that this section was other than compensatory in nature.

"Other decisions relating to § 340.95, which refer to its penal characteristics, at the same time point out that its principal objective is the imposition of liability for damages caused by the intoxication of any person upon the dealer, who, by illegally selling intoxicating liquors, caused such intoxication."

Since our decision in the Adamson case we have followed the rule that, although § 340.95 has some penal characteristics, it does not manifest a legislative intent to impose a penal liability upon a liquor dealer. Although defendant's position that § 340.95 was not intended to be a penal statute is correct, it was not necessary for the court to so instruct the jury in the instant case. Under the instructions given, the jury could impose liability upon defendant only if they found it had violated § 340.95; that the violation was a proximate cause of Kiley's intoxication; and that such intoxication was a proximate cause of the collision. The charge did not permit the jury to impose liability on defendant merely to penalize it.

■ Defendant's primary contention is that the verdict is excessive and is not limited to compensation for whatever injury plaintiffs have sustained "in person or property, or means of support" by the death of their son.

Since plaintiffs are the parents of Lloyd, each has a right of action for damages under § 340.95 for such injury. Defendant contends, however, that the Civil Damage Act restricts damages to recovery for injury "in person or property, or means of support," and that these classifications are not coextensive or equatable with "pecuniary" or "monetary" or "financial loss," as the trial court charged. The charge included the following language:

"Plaintiffs' damages in this case are limited to the pecuniary or monetary loss which they suffered by the death of their son on December 23, 1958. You cannot consider sorrow or grief or heartache. Your verdict, if you find for plaintiffs, can only be for the financial loss which the plaintiffs suffered on account of the death of Lloyd Herbes.

\*  \*  \*  \*  \*

"You may also consider the probable duration of the life of Lloyd Herbes, if this accident had not happened. You may consider Lloyd's age; his health; his habits; talents; prospects; industry; his contributions to his parents in money, property, or services; all these, and any other matters proving the money value of the continuance of Lloyd's life to his parents, the plaintiffs."

Defendant contends that these instructions would be appropriate in an action brought under the death-by-wrongful-act statute but is an erroneous statement of the law with respect to damages recoverable under the Civil Damage Act. We must agree with this contention.

We have heretofore discussed the distinctions between damages recoverable under the Civil Damage Act and the death-by-wrongful-act statute in Beck v. Groe, 245 Minn. 28, 34, 70 N. W. (2d) 886, 892, 52 A. L. R. (2d) 875, 883, where we pointed out:

"By the wrongful death act the surviving spouse and next of kin are given rights within the limits of the statute to recover damages measured by the monetary loss to those who come within its provisions. * * * The element of dependency is not involved in this statute; the element of pecuniary loss is. * * *

* * * * *

"The wrongful death act and the civil damage act are wholly unrelated both as to scope and purpose."

See, Adamson v. Dougherty, *supra;* Hartwig v. Loyal Order of Moose, 253 Minn. 347, 91 N. W. (2d) 794, 75 A. L. R. (2d) 459; Bundy v. City of Fridley, 265 Minn. 549, 122 N. W. (2d) 585; Lund v. Village of Watson, 260 Minn. 273, 109 N. W. (2d) 564.

In the recent case of Bundy v. City of Fridley, *supra,* we reaffirmed the distinction between the death-by-wrongful-act statute and the Civil Damage Act previously recognized in Beck v. Groe, *supra,* and the other cases above cited. In the Bundy case this court was faced with the claim that the words "means of support" in the Civil Damage Act were equivalent to the words "pecuniary loss" in the death-by-wrongful-act statute as we had construed them in Fussner v. Andert, 261 Minn. 347, 113 N. W. (2d) 355. This court rejected that

argument in the Bundy case, stating (265 Minn. 552, 122 N. W. [2d] 588):

"* * * That the legislature did not intend to equate pecuniary injuries with injury to means of support is obvious from the fact that it expressly enumerated the distinct types of injuries for which recovery could be had, without employing the general phrase utilized in the death-by-wrongful-act statute. Had it seen fit to permit recovery for pecuniary loss, appropriate language was available for that purpose. The death-by-wrongful-act statute affords the surviving spouse and next of kin a remedy for single pecuniary loss. The Civil Damage Act provides a classification of actionable injuries for which damages may be had."

The instructions relating to damages in the instant case apply to a suit seeking recovery of pecuniary loss under the death-by-wrongful-act statute rather than to one seeking recovery strictly for injury to "person or property, or means of support" under the Civil Damage Act.

■ In the Bundy case we made it clear that although we have adopted a generally broad and liberal attitude toward the Civil Damage Act, we are nevertheless, in construing the term "means of support," limited to its natural and ordinary meaning consistent with common usage of the term. See, 17 Dunnell, Dig. (3 ed.) § 8968. In State Farm Mutual Auto. Ins. Co. v. Village of Isle, 265 Minn. 360, 366, 122 N. W. (2d) 36, 40, we considered the meaning of the term as it applied to the wife of an injured husband and said:

"* * * Generally speaking, in actions under civil damage enactments it has been held that 'means of support' has reference to the standard of living to which a wife is accustomed, taking into consideration the physical capabilities and earning capacity of her husband, and that it should not be limited to an evaluation of the bare necessities which might sustain her."

■ In the Bundy case we approved the decision of the Supreme Court of North Dakota in Iszler v. Jorda (N. D.) 80 N. W. (2d) 665, 668, 64 A. L. R. (2d) 696, 701. There, in a parents' action to recover under the Civil Damage Act of that state for the death of an

unmarried minor son, the court, in considering the extent of recovery for damages resulting from injury to means of support, held:

"* * * [W]e think it clear that the evidence shows no injury to means of support. These plaintiffs were in comfortable circumstances prior to William's death. They remained in such circumstances, afterwards. There is no evidence whatever in the record that William's death in any way affected the standard of living they had been maintaining or forced them to exercise any economies they had not theretofore exercised. They were able to and did hire a man to do some of William's work and as far as the record shows their farming operations continued upon the same scale as before. It is true, that their net income may be somewhat less but diminution of income does not of itself constitute an injury to means of support."

In the Bundy case our conclusion was (265 Minn. 553, 122 N. W. [2d] 588):

"From an examination of the authorities, the general rule seems to be that to recover in an action for injury in 'means of support' the plaintiff must show that in consequence of the wrongful acts complained of the plaintiff's standard of living or accustomed means of maintenance has been lost or curtailed so that he has been reduced to a state of dependence by being deprived of the support which he had theretofore enjoyed. But as pointed out in Iszler v. Jorda, *supra,* the mere fact of diminution of income does not of itself constitute an injury to means of support."

It is thus well established that the words "means of support" envision a reduction of a plaintiff's standard of living. Viewing the evidence as a whole, we find nothing in this case to indicate that the parents' standard of living was altered by the death of their son. Anton and Mary Herbes had lived on their farm and operated it by themselves prior to the death of their son, and they apparently continued to do so at the same level of production after December 23, 1958. There is nothing to show that the income derived from the farm, upon which the parents' standard of living had theretofore depended, declined after the accident involving the death of Lloyd. It is true that during the period from June 1958 to December 1958 Lloyd made gifts to his

parents of furniture and of $800 in cash out of the wages he received from Federal Container Corporation. There was also testimony to the effect that Lloyd intended to return to work full time on the farm, in which event his services would have been valued at $100 to $125 per month. There was also testimony that the earnings of the farm would have been increased by his return. But the fact that plaintiffs will be deprived of those benefits in the future does not affect their ability to maintain themselves at the living standard to which they have heretofore been accustomed. The capability of the plaintiffs to continue to do so has not changed, although it is claimed that plaintiff Anton Herbes suffers to some extent from arthritis. The record as it stands does not presently establish loss of means of support.

■ With respect to whether plaintiffs sustained an injury to property by the death of Lloyd, it has been held that destruction of the right of parents to the earnings and services of a minor son and the payment by the father of the minor son's funeral expenses constitute an injury to "property" within the meaning of the Civil Damage Act. Iszler v. Jorda, *supra.* The record shows that the plaintiffs spent $1,418 in burial expenses for Lloyd. The record also clearly establishes, we think, that the plaintiffs were deprived of services and earnings of their minor son due to the illegal sale of intoxicating liquor. Under the circumstances they are entitled to recover the burial expenses and damages for the loss of Lloyd's services and earnings up to the time he would have attained his majority as an injury to property. The court so held in Iszler v. Jorda, *supra,* and we see no reason why that rule should not be applied in this case. This court has already recognized the principle directing such a holding. The corollary of the child's duty to render services to the parent is the right of the parent to own, possess, enjoy, and dispose of such services. The right to own, possess, enjoy, and dispose of a thing is the essence of a property right. 15 Dunnell, Dig. (3 ed.) § 7849. So, where a parent is deprived of the services of a minor child, there has been a consequent injury to property which is compensatory under the Civil Damage Act.

■ It is obvious, however, that the amount of the verdict far exceeds any damages to which plaintiffs are entitled under the Civil

Damage Act. As we have pointed out, the record fails to establish injury to them in their "means of support," and injury to their persons is of course not involved. The funeral expenses and damages based on the earnings and services which might reasonably have been furnished plaintiffs by Lloyd during his minority do not justify the verdict. That it is excessive to the extent of requiring a reversal is clear.

It is equally clear from the record that liability has been established, justifying a reversal and a new trial on the issue of damages only. See, 1 Dunnell, Dig. (3 ed.) § 430, and cases cited under notes 5.01 and 5.03.

We observe that defendant did not object at the trial to the instructions dealing with the damages to which plaintiffs were entitled, nor did it assign such instructions as error with respect to fundamental law and controlling principle in a motion for a new trial, pursuant to Rule 51, Rules of Civil Procedure. Ordinarily, we would refuse to pass on its contention now made that the trial court erred in such instructions. We have considered them, however, since this case does not come wholly within the rule generally applicable. The question has been argued on appeal and is certain to arise on a retrial. As was said by Mr. Justice Peterson in Christensen v. Hennepin Transp. Co. Inc. 215 Minn. 394, 402, 10 N. W. (2d) 406, 412, 147 A. L. R. 945, 952:

"* * * Sound judicial administration requires that not only unnecessary trials and appeals be avoided, but that cases be tried under correct rules of law. To that end, where a new trial is ordered, the appellate court will consider questions not technically before it which will arise on a new trial, especially where they may be decisive. [Citations omitted.]"

There must therefore be a new trial because of the rules governing the application of the Civil Damage Act, the excessiveness of the verdict, and the other errors adverted to in this opinion.

Reversed and a new trial granted on the issue of damages only.

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

MR. JUSTICE ROGOSHESKE took no part in the consideration or decision of this case.