STATE of Minnesota, Appellant,

v.

Kathleen Riga McKOWN,
Respondent (CX–90–766),

William Lisle McKown,
Respondent (C1–90–767),

Mario Victor Tosto, Defendant.

Nos. CX–90–766, C1–90–767.

Court of Appeals of Minnesota.

Oct. 16, 1990.

Review Granted Dec. 14, 1990.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Johnson, Hennepin Co. Atty., J. Michael Richardson, Asst. Hennepin Co. Atty., Minneapolis, for appellant.

Peter J. Thompson, Thompson & Lundquist, Minneapolis, and Ronald J. Riach, Peterson, Franke & Riach, Roseville, for respondents.

John Stuart, State Public Defender, Minneapolis (Observer) for defendant.

Terrence J. Fleming, Lindquist & Vennum, Minneapolis, for amicus curiae Church of Christ, Scientist.

Peter M. Lancaster, Dorsey & Whitney, Minneapolis, for amicus curiae Minnesota Civil Liberties Union.

Considered and decided by GARDEBRING, P.J., and HUSPENI and DAVIES, JJ.

## OPINION

GARDEBRING, Judge.

This is an appeal by the state from an order dismissing second-degree manslaughter indictments against respondents. We affirm.

## FACTS

Ian Lundman, the 11–year–old son of respondent Kathleen McKown and the stepson of respondent William McKown, died at his home on May 9, 1989, of ketoacidosis diabetes. The McKowns are practicing Christian Scientists. Prior to his death, Ian was ill intermittently for several weeks, and became progressively worse the last three or four days prior to his death. Throughout his illness, the McKowns called upon the assistance of a Christian Science practitioner and a Christian Science nurse to care for him. No medical treatment was sought.

The McKowns were indicted for second-degree manslaughter. A motion to dismiss the indictment was filed asserting lack of probable cause, violation of due process, infringement of first amendment rights, and misinstruction of the grand jury.[1]

The McKowns argued that the "spiritual means or prayer" exemption in the child neglect statute authorized their behavior and precluded the manslaughter charges against them, that no probable cause existed for the indictment, and that the application of the second-degree manslaughter statute to conduct specifically authorized by the state violated due process requirements of fair notice. The trial court agreed and issued an order dismissing the indictments.

The trial court found the child neglect statute and the manslaughter statute were *in pari materia*, that the legislative history of the "spiritual means or prayer" exemption indicated an intent to exempt from sanction parents who in good faith rely upon spiritual means or prayer, and that the grand jury was not properly instructed that the exemption established the applicable standard of care. Finally, the trial court found that the state's failure to provide notice of potentially criminal conduct violated federal and state due process standards of definiteness.

The state appealed from the order. We affirm based on the due process argument and decline to reach other constitutional issues.

## ISSUE

Do the statutory provisions of Minn.Stat. §§ 609.378 and 609.205(1) (1988) provide "inexplicably contradictory" definitions of prohibited behavior so as to violate due process requirements?

---

1. Two amici curiae, the Minnesota Civil Liberties Union and the Church of Christ, Scientist, were granted permission to participate, and filed written memoranda on free exercise and establishment clause issues. The amici were granted leave to participate in this appeal, as well, and each raised substantially the same issue raised at the trial court level. Neither issue is before this court, since the trial court did not reach either the free exercise or establishment clause issues.

## ANALYSIS

We note initially that the circumstances surrounding the tragic death of Ian Lundman are not likely to arise again. The Minnesota legislature has acted to greatly reduce the likelihood that a case such as Ian's would remain undetected in the future. Effective June 1, 1989, the legislature amended the maltreatment of minors reporting statute. Minn.Stat. § 626.556 (Supp.1989). According to the amended statute, a practitioner of healing arts, like a Christian Science practitioner, must report to the proper authorities if lack of medical care may cause imminent and serious danger to the child's health. *Id.*

Once reported to child welfare authorities, an illness like Ian's could support a petition to the district court seeking an order for provision of orthodox medical treatment. Minn.Stat. § 626.556, subd. 10e(c) (Supp.1989), and generally Minn.Stat. ch. 260 (1988).

We believe the new reporting requirement will help prevent future tragedies because it is the practice of good faith adherents to Christian Science to enlist the support of Christian Science nurses and practitioners in dealing with serious illness, and to cooperate fully with public health authorities. At the time of Ian's death, no such reporting requirement existed, and there was, therefore, no opportunity for child welfare authorities to intervene.

The circumstances surrounding Ian's death raise issues concerning the relationship between two provisions of the Minnesota criminal code.

The manslaughter statute, under which the McKowns were charged, provides:

A person who causes the death of another by any of the following means is guilty of manslaughter in the second degree * * *:

(1) by the person's culpable negligence whereby the person creates an unreasonable risk and consciously takes chances of causing death or great bodily harm to another * * *.

Minn.Stat. § 609.205(1) (1988).

The child neglect statute provides:

(a) A parent, legal guardian, or caretaker who willfully deprives a child of necessary food, clothing, shelter, health care, or supervision appropriate to the child's age * * * and which deprivation substantially harms the child's physical or emotional health, * * * is guilty of neglect of a child * * *.

If a parent, guardian or caretaker responsible for the child's care in good faith selects and depends upon spiritual means or prayer for treatment or care of disease or remedial care of the child, this treatment shall constitute "health care" as used in clause (a).

Minn.Stat. § 609.378 (1988).

### I. Statutory Construction

 The trial court concluded that the two statutes are *in pari materia*, and construed them together in finding that "spiritual means or prayer" fully stated the applicable standard of care under the manslaughter statute. In addition, the trial court concluded the "spiritual means or prayer" exemption applies to the manslaughter statute and is an absolute defense to criminal liability.

We are unwilling to interpret the two statutes as did the trial court, either to establish a new standard of care for manslaughter or to construe the "spiritual treatment or prayer" as providing a complete defense. The child neglect statute does not specifically refer to the manslaughter statute, and the "spiritual means or prayer" exemption within it refers to the definition of child neglect.

Although the scope of the manslaughter statute is far beyond that of the child neglect statute, its purpose is similar—to punish the gross negligence of a person who has a duty of care towards another. *Herbes v. Village of Holdingford*, 267 Minn. 75, 125 N.W.2d 426, 431 (1963). Statutes *in pari materia* are those relating to the same person or thing or having a common purpose. *Apple Valley Red–E–Mix, Inc. v. State, Dept. of Pub. Safety*, 352 N.W.2d 402, 404 (Minn.1984). Nevertheless, acts of general negligence are not so plainly similar to acts of child neglect that

the conclusion of *in pari materia* necessarily follows.

Case law is not definitive as to how to determine whether statutes are *in pari materia,* and the leading authority notes:

> The guiding principle, however, is that if it is *natural and reasonable* to think that the understanding of members of the legislature or persons to be affected by a statute, be influenced by another statute, then a court called upon to construe the act in question should also allow its understanding to be similarly influenced.

2A Sands, *Sutherland Statutory Construction,* § 51.03 at 468 (emphasis added). We conclude, particularly in light of ambiguous legislative history, that it is not "natural and reasonable" to presume the legislature believed the manslaughter statute would be influenced by enactment of the child neglect statute. We therefore do not find the two statutes to be *in pari materia.* Nonetheless, it is precisely the lack of clarity in the relationship between the two statutes that leads to our conclusion that the McKowns' due process rights were violated.

## II. Due Process

■ The doctrine that the state must clearly define that behavior for which it proposes to exact a penalty is well-recognized, and can be said, at this point, to be incontrovertible.[2] This "fair notice" requirement, expressed simply, means that

> a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

*Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Further, where a statute imposes criminal penalties, a higher standard of certainty of meaning is required. *State v.*

*Newstrom,* 371 N.W.2d 525, 528 (Minn. 1985).

The requirement of clear definition is directed both to actual notice to ordinary people of what conduct is prohibited and to the elimination of arbitrary and discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). It is also sometimes expressed as a kind of reliance argument, prohibiting

> the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him.

*Raley v. Ohio,* 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959). In another similar case, *United States v. Cardiff,* 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952), the Supreme Court struck down a badly drafted statute which contained mutually contradictory directives.

### A. Fair Notice

■ In this instance, there can be little question that the due process fair notice requirement has been violated. The criminal child neglect statute authorizes parents to choose "spiritual means or prayer" in response to illness without respect to the medical condition of the child. The manslaughter statute gives no notice of when its broad proscription might override the seemingly contradictory permission given by the child neglect statute to treat the child by such spiritual means.

Further, the child neglect statute is expressed in powerful terms, allowing the parents not only to "select" but also to "depend upon" spiritual means or prayer, with no warning or caveat that such dependence may be deemed criminal solely due to the outcome of the treatment. The legislature could, of course, have built into the statute such a limitation, as has the legislature of Oklahoma. That body, in its child neglect statute, has authorized par-

---

**2.** While modern case law on this issue is grounded almost exclusively on the fourteenth amendment of the United States Constitution and parallel amendments in state constitutions, *e.g.,* Minn. Const. art. I, § 7, other bases clearly exist. In some instances, the Supreme Court has relied upon the sixth amendment's requirement that the accused be informed of the nature and cause of the accusation. *See, e.g., United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

ents to treat illness with spiritual means or prayer, except in those instances in which "permanent physical damage" could result to the child.[3]

But the Minnesota legislature did not include such a limitation. Rather, by enacting "inexplicably contradictory commands," the legislature failed to give adequate notice to Christian Scientists as to its expectations with regard to treatment of their children. *See Raley,* 360 U.S. at 438, 79 S.Ct. at 1266. The interaction of the two statutes is such that no amount of care gives safety, and the parents are left to "divine prophetically" the outcome of their actions, a "gift that mankind does not possess," according to Justice Holmes in an early application of the void-for-vagueness doctrine. *International Harvester Co. v. Kentucky,* 234 U.S. 216, 223–24, 34 S.Ct. 853, 856, 58 L.Ed. 1284 (1914).

Evidence of the difficulty facing the parents in understanding the meaning of these two statutes taken together can be seen in the inability of the prosecutor, noted by the trial court in its memorandum, to articulate for the grand jury their relationship, when specifically asked to do so. The Supreme Court, in another early case in this area, identified the confusion in the lower courts as evidence of the fatal vagueness in the statute in question. *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89–90, 41 S.Ct. 298, 300, 65 L.Ed. 516 (1921). The confusion of the prosecutor seems to us a similar indication of the flaws in this statutory scheme.

## B. Arbitrary Enforcement

■ Further, the statutory scheme creates the opportunity for the kind of arbitrary and discriminatory enforcement also prohibited by due process. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). It is incredible to suggest that parents would be prosecuted under the manslaughter stat-

ute where the death of a child occurred in spite of the application of more orthodox medical treatment. Query: Would a parent be indicted where chemotherapy failed to thwart childhood leukemia? Nevertheless, the state would have us conclude that the choice of spiritual treatment, which has been put on legal footing equal to that of orthodox medical care by the child neglect statute, can result in a manslaughter indictment, simply because of its outcome. That is unacceptably arbitrary, and a violation of due process.

## C. Reliance

■ Our conclusion is further supported by the "reliance" cases in this area.

> Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach. As this Court said in *Raley* [360 U.S. at 438, 79 S.Ct. at 1266], we may not convict "a citizen for exercising a privilege which the State clearly had told him was available to him."

*United States v. Laub,* 385 U.S. 475, 487, 87 S.Ct. 574, 581, 17 L.Ed.2d 526 (1967). It is not likely that a criminal will carefully consider the text of the law before he engages in criminal activity. *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). The Supreme Court has said

> [w]e recognize that in a noncommercial context behavior as a general rule is not mapped out in advance on the basis of statutory language.

*Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974) (footnote omitted).

This is not that case. Evidence before the trial court suggests that, due to the sensitive nature of this issue, many Christian Scientists, including the McKowns,

---

**3.** The statute reads in pertinent part:

Nothing in this section shall be construed to mean a child is endangered for the sole reason the parent or guardian, in good faith, selects and depends upon spiritual means alone through prayer, in accordance with the tenets and practice of a recognized church or religious denomination, for the treatment or cure of disease or remedial care of such child; *provided, that medical care shall be provided where permanent physical damage could result to such child* * * *.

Okla.Stat.Tit. 21, § 852 (1988) (emphasis added).

were specifically aware of the statutory provisions relating to use of spiritual means and prayer. They may have indeed "mapped out" their behavior based upon the statute. While the cases in this area are more likely to involve reliance by the defendant on administrative pronouncements, there is nothing inherent in the concept which would make it inapplicable to an argument of reliance on a specific statutory enactment. The state in this instance has attempted to take away with the one hand—by way of criminal prosecution—that which it apparently granted with the other hand, and upon which defendants relied. This it cannot do, and meet constitutional requirements.

We also note that a statute which impinges on constitutionally-protected rights is subjected to stricter scrutiny as to the adequacy of the notice it provides. *Smith*, 415 U.S. at 573, 94 S.Ct. at 1247. One commentator has called this "the creation of an insulating buffer zone of added protection at the peripheries of several of the Bill of Rights freedoms." Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. 67, 75 (1960).

### D. Lenity

■ We turn next to a related doctrine of criminal law, one not specifically grounded in the fourteenth amendment, but one which we believe buttresses and supports the due process argument. The Supreme Court has frequently concluded that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971).

Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct considered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.

*Liparota v. United States*, 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985). Lenity is particularly appropriate where, as here, the legislative history of a statute or, as in this case, the relationship between two statutory provisions is not clear. While both appellants and respondents cite to particular portions of recorded legislative history as support for their respective arguments, the legislative history, taken as a whole is at best, ambiguous, and at worst, utterly contradictory.

[W]hen choice has to be made between two readings of what conduct [the legislature] has made a crime, it is appropriate, before we choose the harsher alternative, to require that [the legislature] should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.

*United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). We do not believe the legislature has spoken sufficiently clearly on this subject to uphold this indictment.

Finally, we note that this is not one of those cases identified by Justice Holmes when he said,

[t]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or short imprisonment, * * * he may incur the penalty of death.

*Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913).

In this instance, Ian Lundman's parents had no reason to believe that they must engage in the kind of "estimating" Holmes describes. They had not been unequivocably put on notice that their conduct put them at risk, and indeed, may have specifically relied upon official pronouncements of the state that their treatment of Ian was legally authorized.

### DECISION

The death of Ian Lundman was a tragedy, and we acknowledge the important state interest in the protection and nurturance of children. We find, however, that the manslaughter statute, as applied to these defendants, is unconstitutionally vague in light of the "spiritual means or prayer" exemption in the child neglect stat-

ute. Therefore, we affirm the trial court in dismissing the indictments.

Affirmed.