604 So.2d 775 (1992)
William HERMANSON and Christine Hermanson, Petitioners,
v.
STATE of Florida, Respondent.
No. 77067.
Supreme Court of Florida.
July 2, 1992.
Thomas H. Dart of Dart, Ford, Strelec & Spivey, Sarasota, and Larry Klein and Jane Kreusler-Walsh of Klein & Walsh, P.A., West Palm Beach, for petitioners.
Robert A. Butterworth, Atty. Gen. and Peggy A. Quince and Carol M. Dittmar, Asst. Attys. Gen., Tampa, for respondent.
William G. Christopher of Honigman, Miller, Schwartz & Cohn, West Palm Beach, amicus curiae for First Church of Christ, Scientist.
OVERTON, Justice.
This is a petition to review Hermanson v. State, 570 So.2d 322 (Fla. 2d DCA 1990), in which the district court certified the following question as being of great public importance:
IS THE SPIRITUAL TREATMENT PROVISO CONTAINED IN SECTION 415.503(7)(f), FLORIDA STATUTES (1985), A STATUTORY DEFENSE TO A CRIMINAL PROSECUTION UNDER SECTION 827.04(1), FLORIDA STATUTES (1985)?
Id. at 337. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
In this tragic case, Amy Hermanson, the daughter of William and Christine Hermanson, died from untreated juvenile diabetes. The Hermansons, members of the First Church of Christ, Scientist, were charged and convicted of child abuse resulting in third-degree murder for failing to provide Amy with conventional medical treatment. The Hermansons received four-year suspended prison sentences on their murder convictions and were ordered to serve fifteen years' probation. The district court, finding that the spiritual treatment accommodation provision of section 415.503(7)(f), Florida Statutes (1985), did not prevent *776 their prosecution and conviction, affirmed the trial court's sentence and certified the above question. In summary, we find that sections 827.04(1) and 415.503(7)(f), when considered together, are ambiguous and result in a denial of due process because the statutes in question fail to give parents notice of the point at which their reliance on spiritual treatment loses statutory approval and becomes culpably negligent. We further find that a person of ordinary intelligence cannot be expected to understand the extent to which reliance on spiritual healing is permitted and the point at which this reliance constitutes a criminal offense under the subject statutes. The statutes have created a trap that the legislature should address. Accordingly, we quash the decision of the district court.

Statutory History
The statutory provisions are critical to the legal and constitutional issues presented in this case. Florida's child abuse statute, section 827.04(1)-(2), Florida Statutes (1985), provides:
(1) Whoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, permits physical or mental injury to the child, and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to such child, shall be guilty of a felony of the third degree... .
(2) Whoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, permits physical or mental injury to the child, shall be guilty of a misdemeanor of the first degree... .
The third-degree murder provision of section 782.04(4), Florida Statutes (1985), provides that the killing of a human being while engaged in the commission of child abuse constitutes murder in the third degree and is a felony of the second degree. Section 415.503 provides, in part, as follows:
(1) "Abused or neglected child" means a child whose physical or mental health or welfare is harmed, or threatened with harm, by the acts or omissions of the parent or other person responsible for the child's welfare.
... .
(7) "Harm" to a child's health or welfare can occur when the parent or other person responsible for the child's welfare:
... .
(f) Fails to supply the child with adequate food, clothing, shelter, or health care, although financially able to do so or although offered financial or other means to do so; however, a parent or other person responsible for the child's welfare legitimately practicing his religious beliefs, who by reason thereof does not provide specified medical treatment for a child, may not be considered abusive or neglectful for that reason alone, but such an exception does not:
1. Eliminate the requirement that such a case be reported to the department;
2. Prevent the department from investigating such a case; or
3. Preclude a court from ordering, when the health of the child requires it, the provision of medical services by a physician, as defined herein, or treatment by a duly accredited practitioner who relies solely on spiritual means for healing in accordance with the tenets and practices of a well-recognized church or religious organization.
(Emphasis added.)[1]
The religious accommodation provision in section 415.503(7)(f) was initially passed by *777 the legislature in 1975 as section 827.07(2), Florida Statutes (1975), the same chapter that contained the child abuse provision under which the Hermansons were prosecuted. The senate staff analysis of the religious accommodation provision stated that these provisions were "a defense for parents who decline medical treatment for legitimate religious reasons." Staff of Fla. S. Comm. Crim. Just., SB 1186 (1975) Staff Analysis 1 (final May 26, 1975) (available at Fla. Dep't of State, Div. of Archives, Tallahassee, Fla.). In 1983, the Division of Statutory Revision moved the above religious accommodation provision from chapter 827 to chapter 415.

Facts
The facts of this case, as stipulated to by the parties in the trial court, are as follows:
1. The Defendant, William F. Hermanson, is 39 years of age. Mr. Hermanson is married to the Defendant, Christine Hermanson, who is 36 years of age. Since June of 1973, Mr. and Mrs. Hermanson have resided in Sarasota, Florida. At all times material to this case, they resided at... . Mr. Hermanson is a bank vice president, and Mrs. Hermanson is the director of the Sarasota Fine Arts Academy. Mr. and Mrs. Hermanson have graduate degrees from Grand Valley State College and the University of Michigan, respectively. Neither Mr. nor Mrs. Hermanson has ever been arrested for, or convicted of, a crime.
2. Mr. and Mrs. Hermanson were married on May 30, 1970. There have been two children born of this marriage: Eric Thomas Hermanson, date of birth 8/26/77 and Amy Kathleen Hermanson (deceased) date of birth 7/16/79. There are no facts indicating that Mr. or Mrs. Hermanson ever deprived their children of necessary food, clothing or shelter as those terms are used in section 827.04, Florida Statutes.
3. According to the autopsy report of the Medical Examiner, James C. Wilson, M.D., on September 30, 1986, at approximately 1:55 p.m., Amy Hermanson died. Dr. Wilson found the cause of death to be diabetic ketoacidosis due to juvenile onset diabetes mellitus. Additional autopsy findings of dehydration and weight loss were consistent with the disease process. Dr. Wilson believes that the disease could have been diagnosed by a physician prior to death and, within the bounds of medical probability, Amy's death could have been prevented even up to several hours before her death with proper medical treatment.
4. At the time of Amy's death, the Hermanson family, including William, Christine, Eric and Amy, were regular attenders of the First Church of Christ, Scientist in Sarasota. William Hermanson has been a member of the Christian Science Church since childhood, and Christine Hermanson has been a member of the Church of Christ, Scientist since 1969. The Church of Christ, Scientist is a well-recognized church or religious organization, as that term is used in Section 415.503, Florida Statutes.

*778 5. Christian Scientists believe in healing by spiritual means in accordance with the tenets and practices of the Christian Science Church. William and Christine Hermanson, at all times material to the facts in this case, followed the religious teachings of their church and relied upon Christian Science healing in the care and treatment of Amy Hermanson.
6. On or about September 22, 1986, the Hermansons became aware that something was particularly wrong with Amy Hermanson which they believed to be of an emotional nature. They contacted Thomas Keller, a duly-accredited practitioner of the First Church of Christ, Scientist for consultation and treatment in accordance with the religious tenets and beliefs of the Christian Science Religion. Thomas Keller treated Amy from September 22, 1986 until September 30, 1986.
7. On or about September 25, 1986, the Hermansons traveled to Indianapolis, Indiana to attend an annual Christian Science conference on healing and left their children in the care of one Marie Beth Ackerman, age 24, a Christian Scientist employed by the Christian Science Committee on Publications and who was residing with the Hermanson family in Sarasota County, Florida and assisting Mrs. Hermanson as an administrator at the Sarasota Fine Arts Academy. The Hermansons returned to their home in Sarasota County, Florida at approximately 2 a.m. on September 29, 1986.
8. After their arrival, the Hermansons noticed a worsening of Amy's condition. They decided to seek the assistance of a local Christian Science practitioner and at approximately 9 a.m. on September 29, 1986, the Hermansons contacted one Frederick Hillier, a duly-accredited Christian Science practitioner of the First Church of Christ, Scientist whom they secured as a practitioner for Amy. Thereafter, until Amy's death, Hillier provided treatment for Amy relying solely on spiritual means for healing in accordance with the tenets and practices of the First Church of Christ, Scientist.
9. On Monday, September 29, 1986, William Hermanson had a discussion with Jack Morton, the father of Christine Hermanson, wherein Mr. Morton expressed his concern for the health of Amy and suggested the possibility that Amy had diabetes.
10. At approximately 9:30 a.m. on September 30, 1986, Hillier went to the Hermanson home to continue treatment and, due to the fact the Hermansons had been up all night with Amy, suggested that a Christian Science nurse be called to help care for Amy.
11. At approximately 10 a.m. on Tuesday, September 30, 1986, one Molly Jane Sellers was called to the Hermanson residence to assist in the care of Amy Hermanson. Molly Jane Sellers is recognized as a Christian Science nurse by the First Church of Christ, Scientist and has been so recognized for twenty years. In preparation for such accreditation by the Church, Sellers completed a three and one-half year training course. Her area of care primarily relates to the physical needs of the patients and[] would be closely related to the duties performed by a licensed practical nurse.
12. On September 30, 1986 at approximately 11 a.m., William Hermanson was contacted by a counselor from the Department of Health and Rehabilitative Services (Willy Torres) who informed him that they had received a complaint alleging child abuse of his daughter, Amy Hermanson and that a hearing pursuant to said allegation had been set before the Juvenile Court for 1:30 p.m. Torres further informed Mr. Hermanson that the purpose of the hearing was to determine if medical treatment would be court ordered or if treatment as prescribed by the Christian Science practitioner would be ordered at that time.
13. At approximately 12:30 p.m., Mr. Hermanson left his home and traveled to the Sarasota County Courthouse for the hearing pursuant to the notification from Willy Torres. While at the hearing, at approximately 1:27 p.m., Mr. Hermanson received a telephone call from an individual at the Hermanson home who reported *779 that Amy had "taken a turn for the worse and an ambulance had been called." Such information was related to the Court and an order was entered which required that Amy Hermanson be examined by a licensed medical doctor. When paramedics arrived they found that Amy had died.
14. Prior to her death, Amy Hermanson continued under the care and treatment of Frederick Hillier with the assistance of Molly Jane Sellers until approximately 1:27 p.m. September 30, 1986 at which time Amy had died.
15. On or about October 7, 1986, the Department of Health and Rehabilitative Services notified Mr. and Mrs. William Hermanson that it had completed its investigation and had classified the report as unfounded.
Hermanson, 570 So.2d at 325-27.
The district court summarized the facts presented at trial as follows:
In the month or so before her death Amy was having a marked and dramatic weight loss, that she was almost skeletal in her thinness and this was a big change in her appearance. There were great dark circles under her eyes that had never been there before. Her behavior was very different from the usual; she was lethargic and complaining whereas previously she had been bubbly, vivacious, and outgoing. She was seen lying down on the floor to sleep during the day when accompanying her mother to visit music students and lying down on the floor after school at her mother's fine arts academy. She often complained of not feeling well, that her stomach hurt and that she wasn't sleeping well. She was too tired during the day to participate in gym class at school. There was a bluish tint to her skin. Her breath smelled funny, one observer called it a "fruity" odor.
The pathologist who performed the autopsy testified to Amy's skeletal appearance, that her vertebrae and shoulder blades were prominent and her abdomen distended as if she were undernourished. Her eyes were quite sunken, due to the dehydration, although her parents had told the pathologist that on the day before her death she was drinking a lot of fluids but urinating frequently too. They also told him that they had noticed changes in Amy starting about a month previously. Amy had complained of constipation during the last week of her life but at no time seemed feverish although there was intermittent vomiting. The pathologist opined that the illness was chronic, not acute. According to her parents' talk with the pathologist, Amy seemed incoherent on the evening before her death although the next morning she seemed better. The pathologist also testified that vomiting and dehydration are compatible with flu-like symptoms but these, added to a four-week-long history of weight loss with the more severe conditions reported, would not be indicative of flu.
Finally, the jury was shown photographs of Amy taken shortly after she died before her body was removed from the home by the paramedics as well as some taken before the autopsy was performed.
Id. at 336-37.
The evidence and the stipulated facts established that the Hermansons treated Amy in accordance with their Christian Science beliefs. On the day of Amy's death, a Christian Science nurse had been summoned to the home to care for her. The nurse testified that Amy was unresponsive and that, when she began vomiting and her condition worsened, she recommended that an ambulance should be called. The Christian Science practitioner who was present advised the nurse that the church headquarters in Boston should be contacted before an ambulance was called. After placing a call to Boston, an ambulance was summoned.
In its argument to the jury, the State asserted that the Hermansons' reliance on Christian Science healing practices under these circumstances constituted culpable negligence. The basis of its argument was that the Hermansons were not legitimately practicing their religious beliefs. Drawing *780 on the evidence that the Christian Science nurse had called an ambulance when Amy began vomiting, the State suggested that the Christian Science Church recognizes conventional medical care and, therefore, the Hermansons had not been legitimately practicing their religious beliefs when they failed to seek medical care before Amy's death. No specific evidence was introduced by either side on the question of when, if at all, the Christian Science faith allows its members to call for medical attention. The Hermansons, on the other hand, argued to the jury that they should not be convicted of a criminal offense because they were "legitimately" practicing their faith in accordance with the accommodation provision of section 415.503(7)(f).
The jury, after one and one-half hours of deliberation, sought the answer to three questions: "(1) As a Christian Scientist do they have a choice to go to a medical doctor if they want to? (2) Or if not, can they call a doctor at a certain point? (3) Do they need permission first?" In response, the court advised the jurors that they must look to the evidence presented during the trial to find the answers. Counsel for both parties had previously agreed to this response by the trial court. The jury found the Hermansons guilty of felony child abuse and third-degree murder, and they were sentenced to four-year suspended prison sentences, with fifteen years' probation, on condition that they provide regular medical examinations and treatment for their surviving children.
On appeal, the district court affirmed, finding that the statutory accommodation section in 415.503(7)(f) applied only to matters contained in chapter 415 and that that provision did not provide any protection from criminal penalties for actual child abuse or neglect in chapters 782 and 827, Florida Statutes (1985). The district court rejected the Hermansons' claim that the evidence did not establish that they had acted willfully or with culpable negligence under the circumstances of this case. The district court agreed with the trial court that, when they returned from Indiana thirty-six hours before Amy's death and had seen that her condition had worsened, the Hermansons were placed on notice "that their attempts at spiritual treatment were unavailing and [that] it was time to call in medical help." Hermanson, 570 So.2d at 332. The district court concluded that those facts justified the issue's being submitted to the jury and the verdict finding the Hermansons guilty of culpable negligence. The district court also rejected the Hermansons' claim of a due process violation for lack of notice of when their conduct became criminal. In rejecting this contention, the district court relied on the decision of the California Supreme Court in Walker v. Superior Court, 47 Cal.3d 112, 253 Cal. Rptr. 1, 21, 763 P.2d 852, 872 (1988), cert. denied, 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989), in which that court stated:
"[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree... `An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it' by common experience in the circumstances known to the actor." (Nash v. United States (1913) 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232; see also Coates v. City of Cincinnati, (1971) 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214.) The "matter of degree" that persons relying on prayer treatment must estimate rightly is the point at which their course of conduct becomes criminally negligent. In terms of notice, due process requires no more. (Burg v. Municipal Court, supra, 35 Cal.3d [257] at p. 270, 198 Cal. Rptr. 145, 673 P.2d 732.)
Hermanson, 570 So.2d at 332.
In this appeal, the Hermansons challenge the district court decision on the following four issues: (1) that the Florida Statutes under which they were convicted did not give them fair warning of the consequences of practicing their religious belief and their conviction was, therefore, a denial of due process; (2) that the Hermansons were entitled to a judgment of acquittal because the evidence presented at trial *781 failed to establish culpable negligence beyond a reasonable doubt; (3) that permitting a jury to decide the reasonableness of the Hermansons in following their religious beliefs was a violation of the First Amendment freedom of religion; and (4) that the trial court erred in not granting a mistrial when the prosecutor stated in closing argument that Christian Science recognizes conventional medical treatment, which was not supported by any evidence in the record. We choose to discuss only the first issue because we find that it is dispositive.

Due Process
In asserting that they were denied due process, the Hermansons claim that the statutes failed to give them sufficient notice of when their treatment of their child in accordance with their religious beliefs became criminal. They argue that their position is supported by (1) the fact that it took the district court of appeal nine pages to explain how it arrived at its conclusion that the exemption for spiritual treatment was only part of the civil child abuse statute, not the criminal child abuse statute and (2) the trial court's construing the statute differently, holding that they were protected by the provision of section 415.503(7)(f) to the extent of making it a jury issue.
The United States Supreme Court, in United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952), stated that confusion in lower courts is evidence of vagueness which violates due process. Furthermore, in Linville v. State, 359 So.2d 450, 453-54 (Fla. 1978), we held that due process is lacking where "a man of common intelligence cannot be expected to discern what activity the statute is seeking to proscribe." In State v. McKown, 461 N.W.2d 720 (Minn. Ct. App. 1990), aff'd, 475 N.W.2d 63 (Minn. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992), a child's parents utilized a Christian Science practitioner and a Christian Science nurse, but did not seek conventional medical treatment. The McKowns were indicted for second-degree manslaughter when their child died of untreated diabetes. The issue in that case was whether the child abuse statute, which contained an exception for spiritual treatment similar to the Florida statute, was to be construed in conjunction with a manslaughter statute that was based on culpable negligence resulting in death. In finding a violation of due process, the Minnesota court concluded that there was a "lack of clarity in the relationship between the two statutes." Id. at 723.
[T]he state would have us conclude that the choice of spiritual treatment, which has been put on legal footing equal to that of orthodox medical care by the child neglect statute, can result in a manslaughter indictment, simply because of its outcome. That is unacceptably arbitrary, and a violation of due process.
Id. at 724. The court further stated:
Evidence before the trial court suggests that, due to the sensitive nature of this issue, many Christian Scientists, including the McKowns, were specifically aware of the statutory provisions relating to use of spiritual means and prayer. They may have indeed "mapped out" their behavior based upon the statute. While the cases in this area are more likely to involve reliance by the defendant on administrative pronouncements, there is nothing inherent in the concept which would make it inapplicable to an argument of reliance on a specific statutory enactment. The state in this instance has attempted to take away with the one hand  by way of criminal prosecution  that which it apparently granted with the other hand, and upon which defendants relied. This it cannot do, and meet constitutional requirements.
Id. at 724-25.
The State, in this instance, relies primarily on the decision of the Supreme Court of California in Walker. In Walker, a child died from untreated meningitis as a result of her mother's reliance on spiritual means in treating the child's illness. The mother, charged with manslaughter and felony child endangerment, argued that a religious accommodation provision found in a California misdemeanor child neglect statute, similar to chapter 415, barred her prosecution *782 under the California manslaughter statute. The mother argued that "the statutory scheme violate[d] her right to fair notice by allowing punishment under sections 192(b) and 273(a)(1) for the same conduct that is assertedly accommodated under section 270." Walker, 253 Cal. Rptr. at 21, 763 P.2d at 872. In rejecting this claim, the California Supreme Court explained that the statutes were clearly distinguishable and, in light of their differing objectives, the statutes could not be said to constitute inexplicably contradictory commands with respect to their respective requirements. Id. at 22, 763 P.2d at 873.
In addressing the lack of notice claim, the State relies on the previously quoted statements in the Walker decision, particularly the conclusion that "persons relying on prayer treatment must estimate rightly" to avoid criminal prosecution because "due process requires no more." Walker, 253 Cal. Rptr. at 20-21, 763 P.2d at 871-72. Pennsylvania and Indiana have taken a similar view and rejected similar due process arguments. See Commonwealth v. Barnhart, 345 Pa.Super. 10, 497 A.2d 616 (1985), cert. denied, 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 34 (1988); Hall v. State, 493 N.E.2d 433 (Ind. 1986). The State asserts that we should also reject the Minnesota court's reasoning in McKown in part because the spiritual treatment exception in that case was contained in a criminal child abuse statute, while the provision in the Florida statute is contained in the child dependency statute.
The United States Supreme Court has stated that one of the purposes of due process is "to insure that no individual is convicted unless `a fair warning [has first been] given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" Mourning v. Family Publications Serv., Inc., 411 U.S. 356, 375, 93 S.Ct. 1652, 1663, 36 L.Ed.2d 318 (1973) (quoting McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931)). In Linville, this Court explained that a person of common intelligence must be able to determine what type of activity the statute is seeking to proscribe.
We disagree with the view of the Supreme Court of California in Walker that, in considering the application of this type of religious accommodation statute, persons relying on the statute and its allowance for prayer as treatment are granted only the opportunity to guess rightly with regard to their utilization of spiritual treatment. In commenting on this type of situation, one author has stated: "By authorizing conduct in one statute, but declaring that same conduct criminal under another statute, the State trapped the Hermansons, who had no fair warning that the State would consider their conduct criminal." Christine A. Clark, Religious Accommodation and Criminal Liability, 17 Fla.St. U.L.Rev. 559, 585 (1990) (footnotes omitted). We agree.
To say that the statutes in question establish a line of demarcation at which a person of common intelligence would know his or her conduct is or is not criminal ignores the fact that, not only did the judges of both the circuit court and the district court of appeal have difficulty understanding the interrelationship of the statutes in question, but, as indicated by their questions, the jurors also had problems understanding what was required.
In this instance, we conclude that the legislature has failed to clearly indicate the point at which a parent's reliance on his or her religious beliefs in the treatment of his or her children becomes criminal conduct.[2] If the legislature desires to provide for religious accommodation while protecting the children of the state, the legislature must clearly indicate when a parent's conduct becomes criminal. As stated by another commentator: "Whatever choices are made ... both the policy and the letter of the law should be clear and clearly stated, so that those who believe in healing by prayer rather than medical treatment are *783 aware of the potential liabilities they may incur." Catherine W. Laughran, Comment, Religious Beliefs and the Criminal Justice System: Some Problems of the Faith Healer, 8 Loy.L.A.L.Rev. 396, 431 (1975).
Accordingly, for the reasons expressed, we quash the decision of the district court of appeal and remand this case with directions that the trial court's adjudication of guilt and sentence be vacated and the petitioners discharged.
It is so ordered.
BARKETT, C.J., and McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] The following are some of the jurisdictions that have enacted legislation recognizing spiritual healing. Alabama: Ala. Code § 13A-13-6(b) (1982), id. § 26-14-1(2) (1990); Alaska: Alaska Stat. § 47.17.020(d) (Supp. 1988); Arizona: Ariz. Rev. Stat. Ann. § 8-531.01 (1989); Arkansas: Ark. Code Ann. § 12-12-502(3) (Michie 1987); California: Cal. Penal Code § 270 (West 1988), id. § 11165.2(b) (West Supp. 1989); Cal.Welf. & Inst.Code § 16509.1 (West Supp. 1991), id. § 18950.5 (West 1991); Colorado: Colo. Rev. Stat. § 14-6-101 (1989), id. § 19-3-103 (Supp. 1990); Delaware: Del. Code Ann. tit. 16, § 907 (1983), id. tit. 11, § 1104 (1987); District of Columbia: D.C. Code Ann. § 2-1356 (1988); Hawaii: Haw. Rev. Stat. § 350-4 (1985); Idaho: Idaho Code § 16-1602(s)(1) (Supp. 1992), id. § 16-1616(c) (1979), id. §§ 18-401(2), -1501(3) (1987); Iowa: Iowa Code §§ 232.68(2)(c), 726.6(1)(d) (1991); Kansas: Kan. Stat. Ann. § 21-3608(1)(c) (1988); Maine: Me. Rev. Stat. Ann. tit. 17-A, § 557 (West 1983), id. tit. 22, § 4010 (West Supp. 1992); Maryland: Md.Fam.Law Code Ann. § 5-701(n)(2) (Supp. 1991); Md. Health Occ.Code Ann. §§ 7-102(a), 14-102(2) (1991); Missouri: Mo. Ann. Stat. § 210.115.3 (Vernon Supp. 1992), id. § 568.040.2(4) (Vernon 1979), id. § 568.050.2 (Vernon Supp. 1992); Nevada: Nev. Rev. Stat. Ann. §§ 200.5085, 432B.020(2) (Michie 1991); New Hampshire: N.H. Rev. Stat. Ann. § 169-C:3 XIX(c) (1990), id. § 170-C.5 II (1990), id. § 639.3 IV (1991); North Dakota: N.D. Cent. Code § 50-25.1-05.1(2) (1989); Rhode Island: R.I. Gen. Laws § 40-11-15 (1990); South Dakota: S.D. Codified Laws Ann. § 25-7-16 (Supp. 1991), id. § 25-7-17.1 (1984), id. § 26-8A-23 (Supp. 1991); Tennessee: Tenn. Code Ann. § 71-6-102(1) (1987), id. § 37-1-157(c) (1991); Utah: Utah Code Ann. § 78-3a-19.5 (1992); Vermont: Vt. Stat. Ann. tit. 33, § 4913(C) (1991); Virginia: Va. Code Ann. §§ 18.2-314, -371.1 (Michie 1988), id. § 63.1-248.2A2 (Michie 1991); Wyoming: Wyo. Stat. § 14-3-202(vii) (1991), id. § 35-1-201 (1988).
[2] We distinguish this case from Nicholson v. State, 600 So.2d 1101 (Fla. 1992). The circumstances in this case are entirely different.